PHILLIP A. TALBERT
United States Attorney
ROBERT J. ARTUZ
MATTHEW THUESEN
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>    v.<br><br>VIRGIL SEVER SANTA,<br><br>                Defendant. | CASE NO. 2:16-CR-00171 KJM<br><br>UNITED STATES'S MOTION IN LIMINE #1 – ADMISSION OF INTRINSIC EVIDENCE OR, IN THE ALTERNATIVE, EXTRINSIC EVIDENCE UNDER RULE 404(b)<br><br>DATE: September 12, 2022<br>TIME: 9:00 a.m.<br>COURT: Hon. Kimberly J. Mueller |

      The United States moves *in limine* for the admission of prior acts evidence, beginning in early 2014 and continuing through May 2016, because it is intrinsic to the crimes charged in Counts 2 and 3 of the Superseding Indictment or, in the alternative, extrinsic evidence under Federal Rule of Evidence 404(b).

### I.    BACKGROUND

**A.    Procedural Background**

      The original Indictment in this case charged Maria Sefora Santa with failure to appear for service of sentence, in violation of 18 U.S.C. § 3146 (Count One), and obstruction of justice, in violation of 18 U.S.C. § 1503 (Count Two). ECF. No. 4. It also charged Virgil Santa ("defendant"), Maria's husband, with one count of concealing a person from arrest, in violation of 18 U.S.C. § 1071 (Count 3). In October 2017, Maria pleaded guilty to Count One, and the United States subsequently dismissed Count Two.

In December 2019, the Grand Jury returned a three-count Superseding Indictment charging the defendant with aiding and abetting Maria's failure to appear for service of sentence, in violation of 18 U.S.C. §§ 2 and 3146(a)(2) (Count One), concealing a person from arrest, in violation of 18 U.S.C. § 1071 (Count Two), and failure to file reports of foreign bank and financial accounts, in violation of 31 U.S.C. §§ 5314 and 5332(a) (Count Three).

Trial against the defendant is scheduled to begin on September 20, 2022.

### B.     Factual Background

This case involves an overarching conspiracy and set of continuing offenses that involved the defendant, his wife Maria, and other family members. These offenses' goals were to help Maria evade surrender for service of this Court's prison sentence, flee from arrest, and hide from law enforcement in Romania and the United States for over two years. As discussed below, the defendant achieved these goals through continuing criminal acts until Maria's arrest in August 2016.

####           i.     Maria is required to surrender for service of her sentence.

In March 2008, the defendant and Maria were indicted on mortgage fraud charges. *United States v. Santa, et. al.*, 2:08-cr-468-KJM (E.D. Cal.). After protracted litigation, in November 2012, Maria pleaded guilty to mail fraud for her participation in the fraud scheme. As part of her plea agreement, the government agreed to dismiss all charges against the defendant. In August 2013, this Court sentenced Maria to 20 months' imprisonment and ordered her to surrender for service of her sentence on January 6, 2014. Although she had waived her right to appeal her case, Maria attempted to delay her surrender by filing a notice of appeal and seeking bail pending appeal through this Court and the Ninth Circuit. No. 2:08-cr-468-KJM, ECF 380. Those efforts failed. After a stay of the Court's order of surrender was effectively terminated on January 30, 2014, Maria was required to surrender immediately.

####           ii.     After faking her suicide, Maria flees to Romania.

After the Court sentenced Maria and before her surrender date, she met with her family members at her Sacramento home to discuss ways in which she could avoid going to prison. *See* MIL No. 2 filed herewith. The persons present at this meeting included, among others, the defendant, Maria's twin sister Magdalena Ciurar (via phone), and Magdalena's then brother-in-law Cornel Ciurar. Cornel overheard Maria talking to Magdalena over the phone and telling her that she was scared and did not want to go to

prison. He then heard the defendant tell Maria to put the phone on speaker so that he could hear the conversation. Cornel overheard Magdalena state that she would write a suicide letter for Maria. She said the letter would say that Maria just walked out the door. Magdalena then told Maria that she had nothing to worry about because she would live like a queen overseas. Cornel witnessed that the defendant was a participant in the conversation and heard him tell Maria that he would not let her go to jail.

On February 3, 2014, the defendant called the Sacramento County Sheriff's Department and reported that, when he woke up, he found Maria missing and a "suicide note." A sheriff's deputy reported to the defendant's home and the defendant represented that he did not know where Maria went. The defendant also filed a missing persons report. The suicide note was written to the defendant in English (not Romanian) and suggested that she killed herself. *See* MIL No. 3 filed herewith. For example, the noted stated things like:

- "By the time you read this I will be gone."
- "Please take care of the kids and yourself. God has forgotten about me. I am a lost ship at sea. Please take care of my mom and dad."
- "I want my life to end like the river flows freely with no end."

The Sheriff's Department took the note very seriously. It organized searches for Maria and sent out a media blast that asked the public for help in locating her. Maria was considered missing for over two years, and the defendant never mentioned to law enforcement that he or other family members had planned to fake her suicide so she could flee the country.

On February 4, 2014, based on a Probation Office petition alleging that Maria violated her pretrial release conditions, this Court issued a warrant for Maria's arrest.

After Maria's faked suicide, the defendant, and likely other family members, helped her flee the United States to avoid prison. Maria was able to stay missing because she likely used her twin sister's identity to travel abroad through Canada or Mexico. At some point, Maria fled to Romania, the Santas' birthplace, where she hid form U.S. authorities. Romanian government records show that Maria was living in Romania no later than April 2015. Specifically, in that month, Maria applied for an identity card to establish residency there. In it, Maria listed her address as a location in Sibiu, Romania. The Romanian records also show that, in December 2014, the defendant also applied for residency in

Romania, listing the same address as that in Maria's application. Travel records show that the defendant was in Romania at the time he applied to establish residency and at the time Maria applied to do the same, as well as numerous other dates in 2014 and 2015.

Shortly before Maria applied to establish Romanian residency, the defendant sold a house in Sacramento where he and Maria had been living with some of their children. At the time of the sale, the house had been deeded to his 20-year-old son. The proceeds of the sale, $62,423.77, were deposited into a US Bank account in the son's name, and $50,500 of these proceeds were quickly wired to defendant's foreign bank account in Romania. Romanian bank records show that the defendant opened this account in December 2014 and added Maria as an authorized user in June 2015. *See* MIL No. 6 filed herewith. These records help demonstrate that the defendant wired these funds to Romania so he could help his wife live comfortably while she was a fugitive from justice. They also show that both the defendant and Maria withdrew almost all the funds in Romania between April and August 2015.

While tax laws required the defendant to disclose his foreign bank account to the IRS in 2016, because it held more than $10,000, he willfully failed to do so to avoid tipping off the IRS that he was living in Romania with his fugitive wife. These acts are basis for Count 3 and contributed to the defendant's overarching conspiracy to help his fugitive wife avoid arrest and prison time in the United States.

While the defendant was helping Maria hide from U.S. authorities as a fugitive, he made efforts to check on the status of U.S. authorities' search for Maria. First, in July 2014, the defendant texted Maria's former appellate counsel to ask if the U.S. Marshals were still looking for Maria. Second, in November 2014, the defendant contacted the Sacramento Sheriff's Office to obtain copies of police reports relating to Maria. Although the defendant knew that his wife was alive and well, he never retracted his missing persons report and never informed any law enforcement authorities, prior to her arrest, that he had contacted Maria.

### iii. The defendant and Maria are found together.

At some point in 2016, Maria crossed back into the United States without detection. In August 2016, federal agents received a tip that Maria was with the defendant at her mother's house in Sacramento. That same day, federal agents observed the defendant and Maria leave the house together in

the defendant's car. Law enforcement agents stopped the car and identified the driver as the defendant and the passenger as Maria. Maria was arrested on her outstanding warrant. A consent-based search of Maria's purse revealed that she was carrying an expired driver's license in the name of her twin sister, as well as other items displaying the sister's name. At the time of the stop, the defendant admitted to federal agents that he knew that the police were looking for Maria.

On the same day of Maria's arrest, the defendant consented to a voluntary interview with federal agents. The interview was recorded. He claimed that he had visited Maria only in Canada about 4–6 months after her disappearance. When asked if he had been in Romania with Maria, the defendant falsely claimed that he had not. He also falsely claimed that he had not been in Romania in 2016, which was inconsistent with the defendant's travel records and U.S. Passport.

The defendant also claimed that Maria had just suddenly showed up in the United States about 3 months prior to her arrest. He admitted that Maria called him from a hotel in Sacramento and asked him to pick her up. He claimed that he met her at the hotel parking lot and that they both stayed there at least one night. The defendant also admitted that he aided Maria by driving her to various places including restaurants, a store, a place to get medicine, and her mother's house. The defendant also admitted to paying for Maria's expenses because she had no money. These expenses included at least the cost of the hotel, food, and gas. He also admitted that he knew the law enforcement authorities were looking for Maria and that she was afraid that she might be found.

As described above, Maria was eventually indicted for failing to surrender for service of her sentence, and the defendant was charged with concealing a person from arrest. ECF 4. Maria pleaded guilty in October 2017. ECF 49. The Court later sentenced Maria to an additional 12 months' imprisonment on top of the 20 months that she received on her original mail fraud conviction. ECF 75.

## II. EVIDENCE OF THE DEFENDANT'S PRIOR ACTS BEFORE MAY 2016 ARE ADMISSIBLE AS INTRINSIC EVIDENCE TO PROVE COUNTS 2 AND 3

Count 1 of the Superseding Indictment charges the defendant with aiding and abetting Maria's failure to surrender.[1] Count 2 charges him with concealing Maria from arrest and harboring her as

---

[1] In an effort to streamline trial, the government is contemplating moving to dismiss Count 1 prior to trial and may proceed only on Counts 2 and 3.

fugitive "beginning not later than on or about May 1, 2016,[2] and continuing through on or about August 26, 2016." This charging language indicates the offense could have begun earlier than May 2016, and it would still be covered by a single count because it is a continuing offense.[3] *See United States v. Strain*, 396 F.3d 689, 697 (5th Cir. 2005) (recognizing that harboring a fugitive may be charged as a continuing offense). Acts that occurred prior to May 2016 (the "prior acts") include the facts discussed above, such as the defendant's (1) conspiracy with Maria and others to fake her suicide, (2) efforts to help Maria flee from authorities and the country, (3) efforts to help her reside in Romania, and (4) transfer of over $50,000 to Romania, so they both could fund their lives abroad and outside the reach of U.S. law enforcement. Given the breadth of the charging language in Count 2, the Court should find that these prior acts are admissible as intrinsic evidence.

Even if the defendant's prior acts, beginning in late 2013 or early 2014, are not fully encompassed by Count 2, they are still intrinsic to the offenses charged in Counts 2 and 3 because, at a minimum, they are all part of the same criminal episode and directly prove many of the offenses' elements. Such elements include knowledge of key facts and intent, which are material issues "simply because the government ha[s] to prove them." *United States v. Mayans*, 17 F.3d 1174, 1182 (9th Cir. 1994). These prior acts are also admissible as intrinsic evidence because they offer a coherent and comprehensible story regarding the commission of the charged offenses.

### A.   Legal Standard for Admitting Prior Acts as Intrinsic Evidence

The Ninth Circuit recognizes two categories of evidence that may be considered intrinsic or "inextricably intertwined" with a charged offense and therefore admitted without regard to Federal Rule of Evidence 404(b). *United States v. Anderson*, 741 F.3d 938, 949 (9th Cir. 2013) (citing Fed. R. Evid. 404(b) advisory committee's notes, which state that Rule 404(b)'s requirements do "not extend to

---

[2] May 2016 is the approximate month that Maria re-entered with United States without detection.

[3] An offense is continuing if it "involves (1) an ongoing course of conduct that causes (2) a harm that lasts as long as that course of conduct persists." *United States v. Holden*, 806 F.3d 1227, 1231 (9th Cir. 2015) (citation omitted). The hallmark of a continuing offense is that it "perdures" beyond the original illegal act. *Toussie v. United States*, 397 U.S. 112, 122 (1970). Continuing offenses involve an ongoing course of conduct that causes harm that lasts as long as the course of conduct exists. *United States v. Morales*, 11 F.3d 915, 921 (9th Cir. 1993); *see also United States v. Mancuso*, 718 F.3d 780, 792 (9th Cir. 2013) ("[a] continuous offense is a continuous, unlawful act or series of acts set on foot by a single impulse").

evidence of acts which are 'intrinsic' to the charged offense"). First, evidence of prior or other acts may be admitted if the evidence "constitutes a part of the transaction that serves as the basis for the criminal charge" or, in other words, is part of a "single criminal episode." *United States v. DeGeorge*, 380 F.3d 1203, 1220 (9th Cir. 2004), quoting *United States v. Vizcarra–Martinez*, 66 F.3d 1006, 1012 (9th Cir. 1995); *see also United States v. Ripimky*, 109 F.3d 1436, 1441 (9th Cir. 1997) ("[T]he policies underlying the rule [in Fed.R.Evid. 404(b)] are simply inapplicable when some offenses committed in a single criminal episode become other acts because the defendant is indicted for less than all of his actions."), overruled on other grounds, *U.S. v. Sablan*, 114 F.3d 913, 916 (9th Cir. 1997). Second, other act evidence may be admitted "when it [is] necessary to do so in order to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime." *DeGeorge*, 380 F.3d at 1220, quoting *Vizcarra–Martinez*, 66 F.3d at 1012–13.

>    **B.   The Defendant's Prior Acts Are Admissible as Intrinsic Evidence Under Counts 2 and 3 Because They Are Part of a Single, Continuing Criminal Episode**

The criminal episode that defines this case is the defendant's collective efforts to help his wife violate this Court's order of surrender and keep her hidden from law enforcement authorities. This single episode began when the defendant conspired with his wife and others to fake Maria's suicide in early 2014 and continued through his efforts to help her flee and hide in Romania where they both lived off funds that the defendant intentionally concealed in a Romanian bank account. *See, e.g., United States v. Babajian*, No. CR 07-00755 DDP, 2009 WL 412333, at *7 (C.D. Cal. Feb. 17, 2009) (holding that evidence of a defendant's prior bad acts were admissible without regard to Rule 404(b) because the acts were part of the same criminal episode). There were no significant breaks in this criminal episode, and it continued further through the conduct alleged in Counts 2 and 3, and until Maria was arrested in August 2016. Moreover, the success of defendant's concealment efforts in 2016 depended largely on the prior acts aimed at achieving the same goal. It is very likely that Maria would have been caught long before 2016 had the defendant not helped her fake her suicide and flee to Romania. This further demonstrates the tight continuity between the prior acts and the defendant's harboring efforts after his wife returned to the U.S. in about May 2016. All of defendant's concealment and harboring efforts, before and after May 2016, were inextricably intertwined acts devoted to the same criminal episode.

Additionally, the prior acts are intrinsic evidence under Count 2 because they directly prove at several elements of the offense. Count 2 requires proof that a federal warrant issued for Maria's arrest, that the defendant knowingly harbored or concealed Maria, and that he intended to prevent her discovery or her arrest. Ninth Cir. Model Crim. Jury Instr. 24.12 (2022 ed.). The defendant's prior acts, discussed above, are direct evidence of these elements. For example, to prove that a federal warrant had issued, the government must introduce evidence of events that occurred in 2014 when the warrant issued, including that Maria faked her own suicide and failed to surrender for service of her sentence. The defendant's conspiracy to fake Maria's suicide is also direct evidence of his knowing concealment and intent to prevent her later arrest. Similarly, the defendant's act of funding Maria's hiding in Romania is direct evidence that he intended to harbor her in a foreign country so she was not exposed to arrest in the U.S.

These prior acts are intrinsic and do not fall under Rule 404(b) because they are not being offered to prove the defendant's character and conformity therewith. "Instead, the evidence is direct evidence, used to flesh out the circumstances surrounding the crime with which the defendant has been charged, thereby allowing the jury to make sense of the testimony in its proper context." *United States v. Ramirez–Jimenez*, 967 F.2d 1321, 1327 (9th Cir. 1992). To exclude this prior act evidence under Count 2 or 3, including defendant's participation in Maria's faked suicide, would result in a substantial distortion of the facts and permit him to make arguments from the evidence that drastically underrepresent his culpability as a concealer and harborer of a fugitive. In sum, the Court should admit this evidence as intrinsic to Counts 2 and 3.

C. **The Defendant's Prior Acts Are Admissible as Intrinsic Evidence Under Counts 2 and 3 Because They Permit a Coherent and Comprehensible Story Regarding the Defendant's Commission of the Crimes**

The defendant's prior acts are also intrinsic evidence under Counts 2 and 3 because they are needed for the government to present a coherent comprehensible story regarding his concealment and harboring of Maria in 2016. "A jury is entitled to know the circumstances and background of a criminal charge. It cannot be expected to make its decision in a void—without knowledge of the time, place, and circumstances of the acts which form the basis of the charge." *United States v. Daly*, 974 F.2d 1215, 1217 (9th Cir. 1992), quoting *United States v. Moore*, 735 F.2d 289, 292 (8th Cir. 1984).

It would be confusing to introduce evidence of the defendant's concealment and harboring in

2016 without explaining to the jury the key preceding events in 2014 and 2015. The government plans to introduce evidence of the events that caused the Court to issue a warrant for her arrest, including her faked suicide, her failure to surrender, and her escape to Romania. Additionally, the jury is likely to be confused as to why it took so long for federal agents to find Maria. The government should be able to tell the jury that the defendant and Maria attempted to fool law enforcement with a fake suicide note so that agents would eventually give up searching for her. Evidence of Maria's flight to Romania also explains why she was successful at evading police for over two years. Such evidence allows the government to tell a coherent and comprehensible story of the defendant's crimes.

### III.   ALTERNATIVELY, THE PRIOR ACTS ARE ADMISSIBLE UNDER RULE 404(b)

#### A.   Legal Standard for Admission of Evidence under Federal Rule of Evidence 404(b)

A "trial judge ha[s] broad discretion to determine the admissibility of evidence." *United States v. Ives*, 609 F.2d 930, 933 (9th Cir. 1979). Relevant evidence of other crimes, wrongs, or acts is admissible to prove non-character matters, such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Fed. R. Evid. 404(b). Rule 404(b) is "an inclusionary rule," *United States v. Sneezer*, 983 F.2d 920, 924 (9th Cir. 1992), under which evidence is inadmissible "only when it proves nothing but the defendant's criminal propensities." *United States v. Tsinnijinnie*, 91 F.3d 1285, 1288 (9th Cir. 1996). Evidence is admissible under Rule 404(b) if: (1) the uncharged act is introduced to prove a material issue in the case; (2) the uncharged act was not too remote in time; (3) sufficient proof exists for the jury to find that the defendant committed the uncharged act; and (4) the uncharged act is similar to the offense charged. *Id.* at 1288–89.

#### B.   Application of the Rule 404(b) Standard to the Present Case

The defendant's "prior acts" are also admissible under Rule 404(b) because they meet all the Ninth Circuit's requirements. First, the prior acts are material to proving multiple elements of Count 2. They are relevant show the defendant's intent, motive, preparation, plan, and knowledge with respect to these offenses. *See, generally,* the government's Rule 404(b) Notices to defense attached as Exhibits A and B and incorporated herein by reference. For example, these acts and associated evidence show that the defendant possessed the intent to conceal and harbor his wife as a fugitive. These acts also show the defendant's motive because he and Maria expressed their willingness to break the law so that Maria

could avoid prison. These acts also show the conspirators' preparation and plan because they discussed details of how they prepared a plan to conceal and harbor her, including (1) faking her suicide (2) helping her flee the United States, and (3) helping her live in a foreign country, e.g., Romania, as a fugitive and outside the reach of U.S. authorities. These acts are also relevant to show the defendant's knowledge of this illicit plan and, despite this knowledge, that he continued to harbor her as a fugitive by taking affirmative steps to deceive law enforcement.

The prior acts are also relevant to show defendant's intent, motive, preparation plan, and knowledge with respect to Count 3. For example, the acts show the defendant possessed the intent and motive to fail to file an FBAR disclosure with IRS. Because he was using his Romanian bank account to harbor Maria in Romania, he did not want the government to know about it. This evidence shows the defendant intentionally failed to notify the government about the bank account so he and his wife could use the money without the fear of U.S. law enforcement.

Second, the prior acts were not too remote in time because they started in early 2014 and flowed continuously up through the charging timeframes of Counts 2 and 3. Third, the government has substantial evidence to prove up the prior acts including percipient witness testimony and documents. Finally, as discussed above in the intrinsic evidence section, there is significant overlap and similarity between the prior acts and those specifically charged under Counts 2 and 3.

## IV.   CONCLUSION

The Court should permit the government to introduce evidence of the defendant's prior acts, as discussed above, because they are intrinsic evidence under Counts 2 and 3 or, in the alternative, admissible evidence under Rule 404(b)(2).

Dated: August 26, 2022

PHILLIP A. TALBERT
United States Attorney

By: /s/ *Robert J. Artuz*
ROBERT J. ARTUZ
MATTHEW THUESEN
Assistant United States Attorneys